## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, E. Austin Wozniak, being duly sworn, depose and state that:

## INTRODUCTION

1.  I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am a Special Agent with the Bureau of Alcohol Tobacco Firearms and Explosives ("ATF") and have been so employed since September 1, 2013. I am currently assigned to the Boston Field Office.

2.  I am a graduate of the Federal Law Enforcement Training Center, where I completed ATF Special Agent Basic Training and the Criminal Investigator Training Program. Prior to my employment with ATF, I was a police officer with the Dallas Police Department in Dallas, Texas for three years. I am a graduate of Marquette University where I received a Bachelor of Science in Accounting in 2010.

3.  I was assigned to the Seattle, Washington, Field Office of ATF for approximately five years, where I worked with agents and other law enforcement agencies to target violent crime. I participated in or directed complex criminal investigations, utilized the National Integrated Ballistic Information Network to identify violent offenders for prosecution, and helped create a task force of officers to investigate a series of highway shootings believed to be linked through ballistics evidence. In June 2019, I transitioned to the Albuquerque Field Office in Albuquerque, New Mexico, where I continued to conduct investigations related to firearms, narcotics, and violent crime. In March of 2021, I joined the Boston Field Division.

4.  I have received training in the recognition, identification, and testing of controlled substances as well as in common methods of trafficking in narcotics. I have participated in surveillance and interdiction operations at known drug locations and have made numerous arrests for drug related crimes. I have further received training in firearms trafficking and the diversion of legal firearms for unlawful purposes, participated in the investigation of many crimes of violence, including robberies, assaults, and homicides, and made numerous arrests for firearms and violent offenses.

## PURPOSE OF AFFIDAVIT

5.  This affidavit is being submitted in support of applications for search warrants to search:

    a.  34 New Whitney Street, Boston, MA 02115 (the "Target Residence");

    b.  A gray Toyota Camry, bearing Massachusetts registration 3MXN55 (the "Target Vehicle");

    c.  An iPhone with the phone number (857) 576-9042 (the "Target Telephone 1"); and

    d.  An iPhone with the phone number (857) 869-1272 (the "Target Telephone 2").

6.  I am currently investigating Glenroy MILLER, a/k/a "Trinny," for violations of Title 21 United States Code, Section 841(a)(1) (distribution of controlled substances), Title 21 United States Code, Section 846 (conspiracy to commit narcotics trafficking offenses), Title 21 United States Code, Section 843 (use of communication facility in the commission of drug related crime), Title 18 United States Code, Section 922(g)(1) (possession of a firearm by a felon), Title 18 United States Code, Section 922(o) (knowing possession of a machine gun), Title 18 United States Code Section 922(a) (dealing firearms without a license), and Title 26

2

United States Code, Section 5861(d) (possession or transfer of an unregistered machine gun) (hereinafter, the "Target Offenses").

7. As detailed below, there is probable cause to believe that the Target Residence, Target Vehicle, Target Telephone 1, and Target Telephone 2 may contain evidence of crimes, contraband, fruits of crimes, or other items illegally possessed, and property designed for use, intended for use, or used in committing crimes, namely, the Target Offenses. A more detailed description of the Target Residence is attached as Exhibit A-1.  A more detailed description of Target Vehicle is attached as Exhibit A-2.  A specific list of items to be searched for and seized from the Target Residence and the Target Vehicle is attached as Exhibit B-1.  A more detailed description of Target Telephone 1 is attached as Exhibit A-3.  A more detailed description of Target Telephone 2 is attached as Exhibit A-4.  A specific list of items to be searched for and seized from Target Telephones 1 and 2 is attached as Exhibit B-2.

8. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested search warrant and does not set forth all of my knowledge about this matter.

## SUMMARY OF PROBABLE CAUSE

9. In May 2023, ATF began an investigation into MILLER.[1]  Between May 18 and May 30, 2023, an ATF cooperating witness ("CW") met MILLER at a Shell Gas Station on

---

[1] According to court documents, on September 17, 2019, in Suffolk Superior Court, MILLER was convicted of Possession of a Firearm without a Permit; Carrying a Firearm with Ammunition; Possession of a Firearm with a Defaced Serial Number; and Resisting Arrest (docket number 1884CR00873).  MILLER was sentenced to 3 years' imprisonment and 2 years' probation.  On

3

Tremont Street at 835 Huntington Avenue.[2] During the meetings, MILLER and the CW engaged in conversations, during which MILLER provided CW his phone number as (857) 576-9042, which is the number associated with Target Telephone 1. As noted below, the CW contacted MILLER at Target Telephone 1 multiples times to purchase contraband and firearms from MILLER.

10. On May 30, 2023, the CW contacted Target Telephone 1 and spoke with MILLER to arrange the logistics and meeting location to make a controlled purchase of ½ ounce (14 grams) of marijuana.[3] MILLER agreed to sell marijuana to the CW and directed the CW by phone from the Shell gas station at 835 Huntington Avenue. Before the controlled purchase, the CW met with ATF, who provided the CW $200 in Agent Cashier Funds.[4] After, the CW drove to the Shell gas station. Upon arrival, the CW received a phone call from MILLER, who directed the CW down the street to the Milkweed Restaurant. MILLER then entered the backseat of the CW's vehicle and provided the CW the suspected marijuana in exchange for $160. The substance was in a

---

July 27, 2016, in West Roxbury District Court, MILLER was convicted of Possession of a Firearm without a Permit (docket number 1506CR001861) and sentenced to 18 months' imprisonment.

[2] The CW is cooperating for both financial compensation and consideration in a pending drug distribution offense. The CW has cooperated since his/her arrest in 2020, conducted more than 100 controlled purchases of evidence on behalf of ATF. The CW has an extensive criminal history including convictions for robbery and drug distribution. Based on this investigation, I believe that information received from the CW is reliable.

[3] The CW's phone calls with MILLER on Target Telephone 1 are recorded.

[4] All controlled purchases in this case followed the same basic pattern. ATF agents searched the CW and the CW's vehicle before and after the buy for unauthorized contraband, provided CW with Agent Cashier Funds for the purchase and audio and video recording equipment. The CW was surveilled to and from the deal, and agents/officers surveilled the transaction. Following the purchases, investigators met the CW at a prearranged location to take the contraband from the CW. Investigators also debriefed the CW. Investigators subsequently reviewed the recordings for other undetected or unreported anomalies to ensure the integrity of the transaction as well as to confirm the veracity of the CW's statements.

package purporting to be marijuana, was green and leafy in appearance, smelled like marijuana, and was consistent with marijuana based on your affiant's training and experience.[5] After, ATF recovered $40 and the marijuana from the CW's vehicle.

11. On June 2, 2023, the CW contacted MILLER at Target Telephone 1 to purchase ½ ounce of marijuana. The CW and Miller agreed to meet at the Shell gas station. That same day, ATF provided to the CW $160 in Agent Cashier Funds, and the CW drove to the gas station, where he met with MILLER and successfully purchased approximately 20 grams of suspected marijuana for $160. The substance was again consistent with marijuana as described above. After, ATF recovered the marijuana from the CW.

12. On July 18, 2023, the CW contacted MILLER at Target Telephone 1 and arranged to purchase fentanyl and marijuana that day. ATF provided the CW $500 in Agent Cashier Funds. MILLER instructed the CW to meet him at 835 Huntington Avenue.[6] After arriving, the CW waited for MILLER and upon his arrival, the two exited the building and got inside of the CW's vehicle. MILLER provided to the CW a quantity of suspected fentanyl and marijuana for $160. Upon his arrival to the prearranged location, the CW gave to ATF the remaining $340 in Agent Cashier Funds and a baggie of suspected fentanyl and a baggie of suspected marijuana. The marijuana weighed approximately 12 grams and was consistent with the appearance and smell of

---

[5] The substance was not field tested as ATF does not maintain kits for testing marijuana.

[6] It should be noted that 835 Huntington Avenue is approximately a 4-minute walk from the Target Residence.

marijuana.  The suspected fentanyl weighed approximately 3 grams.[7]  The fentanyl will be transferred to the Drug Enforcement Administration Northeast Laboratory for further analysis.

13.     On August 7, 2023, the CW contacted MILLER at Target Telephone 1.  MILLER agreed to sell the CW a firearm for $1,500.  MILLER asked the CW if s/he wanted a 9mm or .40 caliber firearm but said he could not do both.  MILLER further stated, "*he* wanted $1,400 for the 'nina' [9mm] and $1,600 for the .40," indicating another person supplied MILLER the firearms to sell.  During the transaction, which happened the same day, MILLER met the CW at 835 Huntington Avenue holding a white plastic shopping bag.  MILLER gave the bag to the CW, who in return, provided to MILLER $1,500.  Inside of the white plastic shopping bag was a Heckler and Koch (H&K) VP .40 caliber pistol bearing serial number 222-21045 with one empty 13-round magazine.  After, ATF received the shopping bag, firearm, and magazine.

14.     On August 24, 2023, the CW and MILLER arranged via Target Telephone 1 the purchase of another firearm as well as a machine gun conversion device ("MCD")[8] for $2,050.  While arranging the logistics of the deal, MILLER again referenced a supplier, saying, "I'm just waiting for my man to pull up," when coordinating the time of the deal.  ATF understands this comment to again indicate MILLER is acquiring the firearm from a supplier and acting as a middleman to conduct the sale.  That same day, the CW again met MILLER at 835 Huntington Avenue.  The CW provided MILLER $2,060 and received a New England Patriots shopping bag

---

[7] ATF conducted a field test of the substance suspected to be fentanyl, which came back inconclusive.

[8] MCDs enable a semi-automatic Glock pistol to fire more than one round with a single trigger pull and therefore convert semi-automatic Glock pistol into machineguns.  MCDs are commonly referred to as "Glock switches."

containing a Size 10 Jordan Nike Retro 6 shoe box.[9] Inside of the shoe box was a Smith and Wesson 9mm SD9VE, 9mm pistol, bearing serial number FBY5487 and one magazine of ammunition containing 14 rounds of ammunition, with a capacity for 16 rounds of ammunition. The CW also received one (1) suspected MCD.

15. After the transaction, ATF placed the shoebox, firearm, magazine, and the suspected MCD into evidence. ATF sent the suspected MCD to the ATF Firearm and Technology Division ("FTD") laboratory for further evaluation. On October 20, 2023, the FTD laboratory confirmed that the device MILLER sold to the CW on August 24, 2023, was in fact a machinegun conversion device.

16. On September 11, 2023, the CW contacted MILLER at Target Telephone 1 and again arranged to purchase two (2) pistols. ATF provided to the CW $3,500 in Agent Cashier Funds. The CW and MILLER met in the lobby of a high rise at 835 Huntington Avenue and conducted the transaction outside while walking through the apartments. MILLER handed the CW a Stop and Shop shopping bag containing a Nike Air Force 1 shoebox. The shoebox contained a Glock 19, 9mm pistol, bearing serial number BVUS031, with an approximately 17 round capacity magazine containing 11 rounds of ammunition. MILLER informed the CW he was unable to obtain the second firearm, again indicative of MILLER obtaining and disposing of firearms in a manner consistent with firearms trafficking. The CW provided MILLER with $1,500 for the one firearm. After the transaction, ATF recovered $2,000 in Agent Cashier Funds as well as the firearm, ammunition, and packaging from the CW.

---

[9] The CW gave MILLER $10 extra because s/he did not have the correct change.

17. On September 27, 2023, after the CW reached out to MILLER's Instagram to re-establish communication, MILLER contacted the CW from a new number: (857) 869-1272, or the phone number associated with Target Telephone 2 from the Telegram application[10] and by phone.

18. On October 8 and 9, 2023, the CW contacted MILLER at the phone number associated with Target Telephone 2 to discuss another purchase of firearms and another MCD.

19. On October 10, 2023, MILLER informed the CW he was on his way back to Boston to conduct the transaction. Officers established a stationary surveillance post in the vicinity of the suspected residence of MILLER: 34 New Whitney Street, the Target Residence. According to an officer, at approximately 2:28 p.m., a gray Toyota sedan bearing Massachusetts registration 3MXN55 (later determined to be the Target Vehicle) appeared on New Whitney Street.[11] The Target Vehicle pulled in front of the Target Residence to perform a U-Turn. Although officers did not see the Target Vehicle park because of the obstructed view, moments later, an officer witnessed a black male wearing a black sweatshirt and black pants go up the flight of stairs of the Target Residence.

---

[10] The Telegram application is an encrypted messaging platform similar to WhatsApp, Signal, and other messaging services. According to Telegram's website, users are required to have a phone number and that contacts will be able to see that phone number when utilizing Telegram.

[11] A query of the plate reveals the car is a short-term lease owned by Expressway Motors in Dorchester, MA.



*Images 1 and 2: taken on October 10, 2023*

20.     This male opened the front door with a key and entered the front door. A few moments later, the same male exited the Target Residence carrying a red and blue tote bag in his hand. Upon seeing the front of the male, who had a goatee and short braided hair, an officer, who previously reviewed MILLER's Massachusetts Registry of Motor Vehicles driver's license registration photograph, recognized the individual as MILLER. The officer observed MILLER proceed down the steps of the Target Residence and out of sight; moments later, the Target Vehicle drove away. Less than approximately one minute after hearing a surveillance report that MILLER's vehicle was departing, your affiant monitored a call from MILLER to the CW from Target Telephone 2, which was placed at 2:35 p.m. As the call was in progress, officers observed the Target Vehicle pulling across Huntington Avenue.

9

21. During the 2:35 p.m. call, the CW followed MILLER behind an apartment across the street from 835 Huntington Street, off of Parker Hill Avenue. Once across the street, MILLER pulled behind an apartment building, and the CW entered the Target Vehicle.



*Image 3: screenshot from the CW's recording device of the Target vehicle on October 10, 2023*

22. MILLER and the CW engaged in an extended conversation during the transaction, during which time the CW purchased a Glock 19X, 9mm pistol with an extended high-capacity magazine, bearing serial number BNVU610 (frame), equipped with an MCD. The CW also purchased a second firearm the CW observed in MILLER's possession, later determined to be a Smith and Wesson M&P 40 Shield, .40 caliber pistol, s/n: HWL8476 with a 15-round magazine. The conversation indicated the source of supply for the MCD's could provide whatever the CW needed. MILLER described the source of supply as a "Spanish guy" who was concerned about meeting the CW out of fear of being robbed. The firearms were provided to the CW in a New England Patriots blue and red tote bag, consistent with what MILLER carried when he exited the

Target Residence approximately five minutes earlier. After the transaction, ATF recovered the bag, shoebox, two firearms, suspected MCD, and ammunition.

23. The firearm with the attached MCD was sent to the ATF FTD laboratory for further evaluation. On October 20, 2023, the FTD laboratory confirmed that the device MILLER sold to the CW along with the two firearms on October 20, 2023, was in fact a machinegun conversion device.

24. After the transaction, surveillance continued to observe MILLER, who pulled his vehicle in front of Sofia's Alteration and Cleaners, at 824 Huntington Avenue, Boston, MA. There, officers observed a thin Hispanic male, approximately 6'1, wearing a camouflaged off-white brand jacket over a light gray hoodie entered the Target Vehicle. MILLER and the FNU LNU sat in the Target Vehicle for approximately 20 minutes, then proceeded in MILLER's car to the Shell Gas Station at 1600 Tremont Street. MILLER pulled the car up to a pump, and the pair loitered for approximately 20 additional minutes, then departed. ATF was unable to maintain surveillance in traffic.

25. Because the purchase of the second gun on the October 10, 2023, was spontaneous, ATF did not have sufficient funds to pay for the firearm and owed MILLER an additional $600. On October 12, 2023, the CW provided MILLER with the additional $600 in Agent Cashier Funds in a recorded conversation and discussed a larger order for MCD's, which MILLER indicated he may be able to arrange.

## ASSOCIATION TO TARGET RESIDENCE

26. In addition to the observations on October 10, 2023, in which MILLER was observed using a key to enter the Target Residence, and then emerging with the bag later

11

determined to contain the firearm, there are several factors which further tie MILLER to the Target Residence.  First, MILLER's driver's license, which was last updated in 2015, lists the Target Residence as his residence.  Second, the Target Residence is the listed address of MILLER's mother, Michelle Gobbi, whose name is on the lease for the Target Residence.  On October 20, 2023, investigators served a subpoena on Trinity Management, LLC, the agent for the Mission Park Apartments, requesting to know the identities of the current occupants of 34 New Whitney Street.  The leasing office provided a copy of a lease agreement for 11 New Whitney Street #809; the leasing agent explained to investigators that the original signed lease agreements are simply transferred to new units when the occupants move within the facility.  The lease agreement specifies Michell Gobbi as the lessee and identifies David Shields and Glenroy MILLER as additional occupants on the lease. The leasing agent and officer manager then specifically stated to investigators that these individuals are the current occupants of the Target Residence, 34 New Whitney Street, and specified that the residence is a townhouse located at that address.

27.     In addition, on September 14, 2023, this Court signed a search warrant for the precise location information related to Target Telephone 1 (22-mj-4482-DHH).  Officers learned that MILLER frequently spent the night in an apartment in Abington, consistent with references MILLER has made to the CW about helping a girlfriend with rent.  However, during the time of the phone tracking, from approximately September 14, 2023, to September 23, 2023, Target Telephone 1 was frequently in a vicinity consistent with the location of the Target Residence.[12]

---

[12] It should be noted however, the search warrants results could only provide a radius as to MILLER's location and could not provide the exact location.

28.     Your affiant further learned that the listed address for Target Telephone 2 (a phone number that MILLER did not begin using until late September) is the Target Residence. Further, on October 23, 2023, your affiant learned from the United States Postal Inspection Service that on October 16, 2023, MILLER received mail at the Target Residence.

## PROBABLE CAUSE SUMMARY

29.     For the reasons set out above, I have probable cause to believe that the Target Residence and Target Vehicle contain fruits, evidence, and instrumentalities of violations of the Target Offenses, as described in Attachment B-1. Based on the above information set forth in Paragraphs 26-28, your affiant believes that the Target Residence is MILLER's residence. Based on my training and experience, it is common to store contraband and other related evidence at one's residence, based on MILLER's actions on October 10, 2023, it appears that MILLER does store contraband at the Target Residence. Moreover, MILLER drove the Target Vehicle from the Target Residence—where he retrieved the firearm—to sell the firearm to the CW.

30.     I have probable cause to believe that Target Telephones 1 and 2 contain fruits, evidence, and instructions of violations of the Target Offenses, as described in Attachment B-2. Specifically, MILLER used Target Telephones 1 and 2 to contact the CW to arrange the controlled buys of narcotics, firearms, and MCDs.

## SEIZURE OF CELLULAR DEVICES AND DATA

31.     In addition to searching the Target Residence and the Target Vehicle for unlawfully possessed firearms and ammunition and evidence that MILLER conspired to distribute controlled substances, agents seek to seize and search Target Telephones 1 and 2. From my training, experience, and information provided to me by other agents, I am aware that individuals frequently

use cellular devices to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social networking websites, including Snapchat; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, utility, and other accounts online. Phones also have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

32.   From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1 and B-2's in smartphones. Based on my knowledge, training, experience, and information provided to me by other agents, I know that files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.

33.   Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B-1's definition of "hardware") can now function essentially as small computers. Examples of similarities include:

   a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

   b.   Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the

data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user generated files, computer storage media, in particular, computers' internal hard drives contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e. Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or

storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

### UNLOCKING DEVICE USING BIOMETRIC FEATURES

34. I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password. In the event law enforcement encounters a locked device, I request permission pursuant to this warrant to order MILLER to press his finger on the fingerprint sensor on Target Telephones 1 and/or 2 or to hold the device up to MILLER's face in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

## CONCLUSION

35. Based on the information described above, I have probable cause to believe that that GLENROY MILLER has committed the Target Offenses.

36. Based on the information described above, I also have probable cause to search the following for evidence, fruits, and instrumentalities of the Target Offenses:

   a. 34 New Whitney Street, Boston, MA 02115 (the "Target Residence"), as further outlined in Attachment B-1;

   b. A gray Toyota Camry, bearing Massachusetts registration 3MXN55 (the "Target Vehicle"), as further outlined in Attachment B-1;

   c. An iPhone with the phone number (857) 576-9042 (the "Target Telephone 1"), as further outlined in Attachment B-2; and

    d.       An iPhone with the phone number (857) 869-1272 (the "Target Telephone 2"), as further outlined in Attachment B-2.

                                  Respectfully submitted,

                                  Austin Wozniak
                                  Special Agent
                                  Bureau of Alcohol, Tobacco, Firearms, and Explosives

~~Signed electronically and~~ sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on this 24th day of October, 2023.

9:35 a.m.

                                  The Honorable David H. Hennessy
                                  United States Magistrate Judge
                                  District of Massachusetts